**William E. BROCK, Secretary of Labor, Petitioner,**

v.

**CATHEDRAL BLUFFS SHALE OIL CO., et al., Respondents.**

No. 84–1492.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1985.

Decided July 29, 1986.

**534**

Barry F. Wisor, Atty., Dept. of Labor, with whom Cynthia L. Attwood, Associate Solicitor, and Michael A. McCord, Counsel, Dept. of Labor, Washington, D.C., were on brief, for petitioner.

Charles Wayne Newcom, Denver, Colo., for respondent Cathedral Bluffs Shale Oil Co. James M. Day, Washington, D.C., was on brief, for respondent Cathedral Bluffs Shale Oil Co.

L. Joseph Ferrara, Washington, D.C., entered an appearance for respondent Federal Mine Safety and Health Review Com'n.

Before BORK and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Occidental Oil Shale, Inc. ("Occidental"), the co-owner and operating partner of the Cathedral Bluffs shale oil project, was is- sued a citation by the Secretary of Labor for a safety standard violation committed by an independent contractor working at its mine.[1] In challenging the citation, Occi- dental did not dispute that under the gov- erning statute it could have been cited for independent contractor violations, but ar- gued that the citation was impermissible under the "Enforcement Policy and Guide- lines for Independent Contractors" publish- ed by the Secretary of Labor in the Federal Register. On review the Federal Mine Safety and Health Review Commission agreed that the record did not "reflect [ ] proper application of the Secretary's new independent contractor enforcement poli- cy" and dismissed the citation. *Secretary of Labor v. Cathedral Bluffs Shale Oil Co.*, 6 F.M.S.H.R.C. 1871, 1873 (Aug. 29, 1984). The principal question presented by the Secretary's petition for review is whether the published enforcement policy was legally binding.

I

Under the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. §§ 801–960 (1982), the Secretary of Labor has responsibility for promulgating "man- datory health or safety standards for the protection of life and prevention of injuries in ... mines," 30 U.S.C. § 811(a), and for assuring compliance with those standards, 30 U.S.C. § 813(a). If, upon inspection of a mine, the Secretary identifies a violation of the Act or of a health or safety standard promulgated under it, he is required, "with reasonable promptness, [to] issue a citation to the operator," 30 U.S.C. § 814(a), and "within a reasonable time ... [to] notify the operator ... of the civil penalty pro- posed to be assessed," 30 U.S.C. § 815(a). If the operator contests the citation or pen- alty, a hearing is held before an administra- tive law judge ("ALJ") of the Federal Mine Safety and Health Review Commission, whose decision may be reviewed by the

---

1. The citation was technically issued to the Ca- thedral Bluffs Shale Oil Company, a partnership between Occidental and the Tenneco Shale Oil Company. However, the record and the briefs uniformly refer to the operator of the Cathedral Bluffs project as "Occidental." For simplicity's sake we do the same.

Commission at its discretion. 30 U.S.C. § 823(d). Judicial review of Commission orders is available in this court. 30 U.S.C. § 816.

The Mine Act declares that "the operators" of the nation's mines have primary responsibility for preventing the existence of unsafe and unhealthful conditions, 30 U.S.C. § 801(e), and throughout the Act the entity charged with compliance is referred to simply as the "operator." *See, e.g.,* 30 U.S.C. §§ 814(a), 815(a), 820(a) & (i). Under the legislation that preceded the Mine Act, the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91–173, 83 Stat. 742 (codified at 30 U.S.C. §§ 801–960 (1976)), "operator" was defined as "any owner, lessee or other person who operates, controls, or supervises a coal mine," 30 U.S.C. § 802(d) (1976). In *Bituminous Coal Operators' Ass'n v. Secretary of Interior,* 547 F.2d 240, 246–47 (4th Cir.1977) (*"BCOA "*), the court interpreted that definition of "operator" to include independent contractors performing services at the production-operator's mine, and held that the Secretary had the power to cite the independent contractor, the operator, or both for independent contractor violations. *Accord Republic Steel Corp. v. Interior Bd. of Mine Operations Appeals,* 581 F.2d 868, 870 & n. 5 (D.C.Cir.1978); *Association of Bituminous Contractors v. Andrus,* 581 F.2d 853, 861–63 (D.C.Cir.1978).

In enacting the Mine Act, Congress amended the definition of "operator" by adding the italicized phrases:

> "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal *or other* mine *or any independent contractor· performing services or construction at such mine*[.]

30 U.S.C. § 802(d). The Senate Report accompanying the bill that became the Mine Act stated that the purpose of this amendment was to give statutory expression to the doctrine of *BCOA, see* S.Rep. No. 181, 95th Cong., 1st Sess. 14 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3414; and the Act was so construed in *Cyprus*

*Industrial Minerals Co. v. FMSHRC,* 664 F.2d.1116 (9th Cir.1981).

Shortly after enactment of the Mine Act, the Secretary initiated a rulemaking proceeding designed to specify, for the benefit of operators and independent contractors, how he would exercise his enforcement discretion. He proposed a scheme whereby, on a job-by-job basis, certain independent contractors would be identified as "operators" before performing work at a mine, and would thereafter generally be held solely responsible for violations of Mine Act regulations. *See* Independent Contractors: Advanced Notice of Proposed Rulemaking, 43 Fed.Reg. 50,716 (1978); Independent Contractors: Proposed Rule, 44 Fed.Reg. 47,746 (1979). This proposal did not survive, however, "in large part" as a result of the (presumably hostile) comments and testimony received about it. Independent Contractors: Final Rule, 45 Fed. Reg. 44,494 (1980). The final rule merely required independent contractors to provide certain information to production-operators before commencing mine work and instituted a voluntary procedure whereby independent contractors could apply for Mine Safety and Health Administration ("MSHA") identification numbers. *See* 30 C.F.R. §§ 45.1–45.6 (1985). The statement of basis and purpose accompanying the final rule specified that under the Act all independent contractors were responsible for complying with safety standards, and that in cases involving independent contractor violations, all production-operators remained ultimately responsible and would be cited "in appropriate circumstances." 45 Fed.Reg. at 44,494. As to what those circumstances might be, the statement of basis and purpose stated that "the final rule does not address the circumstances under which production-operators should be held jointly or severally liable for violations involving independent contractors," but that an "appendix" to the final rule, entitled "Enforcement Policy and Guidelines for Independent Contractors," would "be used by inspectors as guidance in making individual enforcement decisions." *Id.* at 44,494, 44,-495. The appendix—which, unlike the final

rule, is not published in the Code of Federal Regulations—states in relevant part:

> Th[e] "overlapping" compliance responsibility of independent contractors and production-operators means that there may be circumstances in which it is appropriate to issue citations or orders to both the independent contractor and the production-operator for a violation. Enforcement action against production-operators for violations involving independent contractors is ordinarily appropriate in those situations where the production-operator has contributed to the existence of a violation, or the production-operator's miners are exposed to the hazard, or the production-operator has control over the existence of the hazard. Accordingly, as a general rule, a production-operator may be properly cited for a violation involving an independent contractor: (1) when the production-operator has contributed by either an act or an omission to the occurrence of a violation in the course of an independent contractor's work, or (2) when the production-operator has contributed by either an act or omission to the continued existence of a violation committed by an independent contractor, or (3) when the production-operator's miners are exposed to the hazard, or (4) when the production-operator has control over the condition that needs abatement.

45 Fed.Reg. at 44,497.

## II

In 1978, Occidental hired the Gilbert Corporation of Delaware, Inc. ("Gilbert"), to construct three vertical underground shafts at the Cathedral Bluffs mine site in Colorado. On September 4, 1980, a MSHA inspector examined one of the shafts then under construction, which had been sunk to approximately 1125 feet, with horizontal landings cut at predetermined points along the shaft wall. At the last landing, cut at a point 1050 feet below the surface of the mine, no "substantial safety gate" had been constructed, in violation of a mine safety standard. *See* 30 C.F.R. § 57.19100 (1985). Instead, a chain had been hung across the landing—obviously insufficient protection against the risk of materials' being knocked off the landing and striking miners at the shaft's bottom, 75 feet below.

Both Occidental and Gilbert were cited for the violation. Gilbert did not contest its citation, but Occidental, soon after being notified of the Secretary's proposed assessment of a $90 fine, did so. On April 1, 1981, the Secretary filed with the Commission a Petition for Assessment of Civil Penalty; several months later a hearing took place before a Commission ALJ who, on May 12, 1982, issued a decision dismissing the citation. *Secretary of Labor v. Cathedral Bluffs Shale Oil Co.,* 4 F.M.S.H.R.C. 902 (May 12, 1982). The Commission granted the Secretary's petition for discretionary review, and on August 29, 1984, affirmed the dismissal. *Secretary of Labor v. Cathedral Bluffs Shale Oil Co.,* 6 F.M.S.H.R.C. 1871 (Aug. 29, 1984). Its opinion declared that "the appropriate inquiry is whether the record reflects proper application of the Secretary's new independent contractor enforcement policy," *id.* at 1873, and found, for reasons that need not be detailed here, that it did not.

## III

The Secretary's petition for review presents among other points the question whether the enforcement policy was, as the Commission held, a "binding norm" to which the Secretary was required to adhere. *See Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974) (quoting Parker, *The Administrative Procedure Act: A Study in Overestimation,* 60 Yale L.J. 581, 597 (1951)). We find that question to be dispositive of this appeal.

It is axiomatic that an agency must adhere to its own regulations, *see Accardi v. Shaughnessy,* 347 U.S. 260, 265–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954); *California Human Development Corp. v. Brock,* 762 F.2d 1044, 1049 (D.C.Cir.1985), and that it need not adhere to mere "general statement[s] of policy," *Pacific Gas,* 506 F.2d at 38. Unfortunately, there is no axi-

om to distinguish between regulations and general statements of policy. The *Attorney General's Manual on the Administrative Procedure Act ("APA")*, a source that we give "considerable weight," *Pacific Gas*, 506 F.2d at 38 n. 17, defines general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." United States Department of Justice, *Attorney General's Manual on the APA* 30 n. 3 (1947). We have elaborated upon this definition as follows:

> The critical distinction between a substantive rule and a general statement of policy is the different · practical effect that these two types of pronouncements have in subsequent proceedings.... A properly adopted substantive rule establishes a standard of conduct which has the force of law....
>
> A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed.... A policy statement announces the agency's tentative intentions for the future....

*Pacific Gas*, 506 F.2d at 38 (footnote omitted). An agency pronouncement is not deemed a binding regulation merely because it may have "some substantive impact," as long as it "leave[s] the administrator free to exercise his informed discretion." *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666, 668 (D.C.Cir.1978).

The Secretary characterizes the enforcement guidelines at issue in the present case as no more than a "general statement of policy"; in his view, they "merely provide general guidance and do not constitute rig-

id requirements which necessarily bind the Secretary and restrict his statutorily-granted enforcement discretion." Brief for Petitioner at 29–30. Occidental, on the other hand, argues that the Secretary has promulgated a "legislative (i.e., substantive) rule ... which restricts his enforcement discretion." Brief for Respondent at 28. The Commission, as we have seen, agreed with Occidental—so that the preliminary question we face is whether we owe deference on this point to the view of the Secretary, who issued the guidelines, or to the view of the Commission, which adjudicated their effect, or to neither. We confronted a similar issue in *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1552 (D.C.Cir.1984), where we held that the *Secretary's* interpretation of the Mine Act was entitled to great deference "both by the Commission and the courts," and reversed the Commission because it had failed to accord that deference. Though that case involved the Secretary's view of the effect of the Act rather than his view of the effect of his own actions taken under the Act, the latter would seem to be, if anything, an *a fortiori* case for deference to the Secretary. *See, e.g., Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).[2]

Even so, there is deference and there is deference—and the degree accorded to the agency on a point such as this is not overwhelming. While the agency's characterization of an official statement as binding or nonbinding has been given some weight, *see, e.g., Regular Common Carrier Conference v. United States*, 628 F.2d 248, 251 (D.C.Cir.1980); *Pacific Gas*, 506 F.2d at 39, of far greater importance is the language

---

**2.** Other Circuits are divided on the analogous question whether the Secretary or the Occupational Safety and Health Review Commission is due deference with regard to interpretation of the Secretary's regulations issued under the Occupational Safety and Health Act of 1970, Pub.L. No. 91–596, 84 Stat. 1590 (codified at 29 U.S.C. §§ 651–678 (1982)). "The Fourth, Sixth, Eighth and possibly Second Circuits favor the Commission; the First, Fifth, and Tenth Circuits

favor the Secretary.... This court has never decided who deserves deference when the Secretary's interpretation conflicts with OSHRC's." *Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1383 n. 7 (D.C.Cir.1985). We see no reason to depart from the view we announced, with regard to the Mine Act, in *Carolina Stalite*, which leaves interpretive discretion where it normally resides, with the policy-maker rather than the adjudicator.

used in the statement itself. We have, for example, given decisive weight to the agency's choice between the words "may" and "will." In holding that a declaration of the Interstate Commerce Commission was *not* a general statement of policy, we relied upon the fact that the pronouncement at issue declared that "the Commission *will*" make certain demands of applicants for particular certificates. *American Bus Ass'n v. United States,* 627 F.2d 525, 532 (D.C.Cir.1980); while in holding that a pronouncement of the Federal Savings and Loan Insurance Corporation was nothing more than a general statement of policy, we relied upon the use of the word "may" in its description of the agency's intended future course. *Guardian Federal,* 589 F.2d at 666.

In light of this precedent, we see no basis for overturning the Secretary's judgment that his independent contractor enforcement guidelines do not constitute a binding, substantive regulation. The language of the guidelines is replete with indications that the Secretary retained his discretion to cite production-operators as he saw fit. The statement characterizes itself as merely a "general policy" to "be used by inspectors as guidance in making individual enforcement decisions." At its very outset it warns production-operators that nothing it contains should be regarded as altering their basic compliance responsibilities:

> Production-operators are subject to all provisions of the Act, standards and regulations which are applicable to their mining operation. *This overall compliance responsibility of production-operators includes assuring compliance with the standards and regulations which apply to work being performed by independent contractors at the mine.* As a result, independent contractors and production-operators *both* are responsible for compliance with the provisions of the Act, standards and regulations applicable to the work being performed by independent contractors.

45 Fed.Reg. at 44,497 (emphasis added). This caution is meaningless if production-operators' failure to meet their responsibili-

ties will, except in the instances described in the guidelines, categorically go unsanctioned. The statement then goes on to describe those situations in which citation of production-operators for violations involving independent contractors is "ordinarily" appropriate. *Id.* The four criteria which the Commission's decision requires the Secretary to observe so rigidly are introduced by the statement that "*as a general rule,* a production-operator may be properly cited for a violation involving an independent contractor [when]...." *Id.* (emphasis added). It seems to us well within the language of the document for the Secretary to maintain, as he has, that he did not establish a "binding norm," but merely "announced [his] tentative intentions for the future," *Pacific Gas,* 506 F.2d at 38, leaving himself "free to exercise his informed discretion," *Guardian Federal,* 589 F.2d at 666.

Our decision on this point is reinforced by the fact that the statement here in question pertains to an agency's exercise of its enforcement discretion—an area in which the courts have traditionally been most reluctant to interfere. *See, e.g., Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985); *Moog Indus., Inc. v. FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370 (1958) (per curiam); *United States v. Leggett & Platt, Inc.,* 542 F.2d 655, 658 (6th Cir.1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). We think the policies underlying that restraint extend as well to interference by a quasi-judicial agency that has no enforcement responsibilities, such as the Federal Mine Safety and Health Review Commission. At the very least the Commission, and we in our review of the Commission, must be reluctant to find a secretarial commitment to refrain from enforcement where none clearly appears.

Our conclusion is not at all cast in doubt by the fact that the Secretary's guidelines were published in the Federal Register. *Failure* to publish in the Federal Register is indication that the statement in question was *not* meant to be a regulation, *see*

*Brennan v. Ace Hardware Corp.*, 495 F.2d 368, 376 (8th Cir.1974), since the Administrative Procedure Act requires regulations to be so published. *See* 5 U.S.C. §§ 552(a)(1)(D), 553(d) (1982). The converse, however, is not true: *Publication* in the Federal Register does *not* suggest that the matter published *was* meant to be a regulation, since the APA requires general statements of policy to be published as well. *See* 5 U.S.C. § 552(a)(1)(D). The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents "having general applicability *and legal effect,*" 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide shall contain only "each Federal *regulation* of general applicability and current or future effect," 1 C.F.R. § 8.1 (1986) (emphasis added). Insofar as that criterion is concerned, it is noteworthy that the Secretary took pain to exclude the enforcement guidelines from the final rule, and directed that they not be published with the rule in the Code of Federal Regulations. As recited in the statement of basis and purpose accompanying the final rule, it was specifically (in part) the Secretary's belief in the *impracticality* of a binding regulation on this subject that caused him to abandon his original proposal, and to publish the policy in the Federal Register only, as an "appendix" to the regulation. *See* 45 Fed.Reg. at 44,494. By treating the policy as a regulation, the Commission rendered this considered distinction useless, and plainly frustrated the Secretary's intent.

Because the Commission improperly regarded the Secretary's general statement of his enforcement policy as a binding regulation which the Secretary was required strictly to observe, its decision dismissing the citation of Occidental must be reversed and remanded for further action consistent with this opinion.

*So ordered.*