

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CHERI ROLLINS, individually and as guardian ad litem of BLAKE ROLLINS, a minor, | NO. 73635-3-I |
| Appellant, | |
| v. | DIVISION ONE |
| BOMBARDIER RECREATIONAL PRODUCTS, INC., a foreign corporation, | |
| Respondent, | |
| DENNIS LONG and LYNETTE LONG, husband and wife; WILDFUN POWERSPORTS RENTALS, LLC., WILDFUN WATERSPORTS, INC., | PUBLISHED OPINION |
| Defendants. | FILED: December 21, 2015 |

LAU, J. — Cheri Rollins suffered serious injuries when the personal watercraft (jet ski) she tried to start exploded. She appeals the trial court's summary judgment dismissal of her product liability claim against Bombardier Recreational Products (Bombardier). She contends Bombardier negligently designed the model of personal watercraft when it failed to include an engine ventilation system. The trial court

dismissed her product liability claim on summary judgment, reasoning that, as a matter of law, the Federal Boat Safety Act (FBSA) preempted her state product liability claim. Because her claim directly conflicts with the Coast Guard's explicit decision, pursuant to Congressional authority, to exempt personal watercraft from the ventilation system requirement, it defeats the purpose of the FBSA and is therefore preempted. We affirm the order of dismissal.

## FACTS

The main facts are undisputed. On August 1, 2009, Cheri Rollins tried to start a personal watercraft (jet ski) when it exploded.[1] The jet ski was a 1999 Sea-Doo XP Ltd. manufactured by Bombardier and owned by Rollins' parents, Dennis and Lynette Long. The explosion occurred due to accumulated gas vapor in the jet ski's engine compartment. When Rollins engaged the ignition switch, an electrical arc ignited the vapor. Bombardier does not equip these jet skis with a powered ventilation system. Such a system may have prevented the explosion by eliminating the accumulated vapor.

In August 2011, Rollins sued the Longs alleging their failure to properly maintain the jet ski negligently caused her injuries. In April 2012, the Longs filed a third party complaint against Bombardier. The complaint alleged violations of Washington's Product Liability Act (WPLA) and Washington's Consumer Protection Act (CPA). Rollins amended her complaint to assert the same WPLA design-defect claim against Bombardier. The parties agree that the defect underlying Rollins' claim is Bombardier's

---

[1] We use the terms jet ski and personal watercraft interchangeably.

alleged failure to include a powered ventilation system—a "blower" device—on the jet ski.

In June 2013, Bombardier moved for summary judgment dismissal, arguing that federal law preempted Rollins' product liability claim. In September 2013, Rollins and the Longs entered into a Settlement Agreement, entitled "Settlement Agreement, Release, and Assignment." Clerk's Papers (CP) at 2594-99. The Agreement provided that the Longs' insurer, State Farm, paid Rollins $1.2 million. As consideration, Rollins assigned her personal injury claim against Bombardier to the Longs and State Farm. After executing the Agreement, Rollins non-suited her claims, with prejudice, against the Longs. In October 2013, Rollins notified Bombardier that State Farm controlled her claims. In November 2013, Bombardier filed a motion to dismiss "pursuant to CR 12, 17, and 56." CP at 2548-66. Bombardier argued that Rollins' lawsuit was an improper claim for indemnification brought by State Farm. Because the Agreement settled Rollins' claims against the Longs and granted State Farm ownership of her remaining claims, the lawsuit had transformed into an attempt by State Farm to use "[Rollins] as a vessel through which it seeks indemnification from Bombardier." CP at 2555. Bombardier also argued that State Farm was not the party in interest.

The trial court issued two orders addressing Bombardier's two motions—the June 12 motion for summary judgment and the November 21 motion to dismiss. In December 2013, the trial court granted Bombardier's summary judgment motion and dismissed Rollins' product liability claim, reasoning that the claim is preempted by federal law. In January 2014, the trial court issued an order ruling that the settlement agreement between the Longs and Rollins was an "indemnification agreement . . .

collusive in effect." CP at 2791. But the court concluded that Bombardier's November 21 motion to dismiss was rendered moot when it dismissed Rollins' claim on summary judgment. Rollins appeals the trial court's order granting Bombardier's June 12 motion for summary judgment.

ANALYSIS

Standard of Review

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment is proper if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. CR 56(c); Michak, 148 Wn.2d at 794-95. The parties agree on the material facts. The sole issue is whether federal law preempts Rollins' product liability claim.

Preemption

Bombardier contends a federal regulation exempting Bombardier from including powered ventilation systems on its jet skis preempts Rollins' state law claim under the WPLA. Rollins alleges Bombardier's jet ski was defectively designed because it lacked a powered ventilation system.

Federal preemption doctrine derives from the supremacy clause, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI. Federal preemption of state law can be "either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Gade v. Nat'l Solid Waste Mgmt.

-4-

Assoc., 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992). Express preemption occurs when Congress explicitly defines the extent to which it intends to supersede state law. See Cipollone v. Liggett Grp. Inc., 505 U.S. 504, 517, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992). Absent explicit preemptive language, implied preemption can occur in two ways: "field preemption, where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' and conflict pre-emption, where 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Gade, 505 U.S. at 98. "There is a strong presumption against preemption and 'state laws are not superseded by federal law unless that is the clear and manifest purpose of Congress.'" Stevedoring Servs. of Am. Inc. v. Eggert, 129 Wn.2d 17, 24, 914 P.2d 737 (1996) (quoting Washington State Physicians Ins. Exch. & Assn v. Fisons Corp., 122 Wn.2d 299, 327, 858 P.2d 1054 (1993)).

We conclude that federal law impliedly preempts Rollins' state product liability claim because it directly conflicts with federal safety standards promulgated under the FBSA. It therefore "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Sprietsma v. Mercury Marine, 537 U.S. 51, 64, 123 S. Ct. 518, 154 L. Ed. 2d 466 (2002) (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995)).

Implied Conflict Preemption

In the FBSA, Congress explicitly provided that federal regulations of recreational watercraft preempt conflicting state laws. The FBSA "was enacted 'to improve boating

safety,' to authorize 'the establishment of national construction and performance standards for boats and associated equipment,' and to encourage greater 'uniformity of boating laws and regulations as among the several States and the Federal Government.'" Sprietsma, 537 U.S. at 57 (quoting Pub. L. 92-75, § 2, 85 Stat. 213-14). The Senate Report underlying the FBSA explains, "[t]he need for uniformity in standards if interstate commerce is not to be unduly impeded supports the establishment of uniform construction and equipment standards at the Federal level." S. REP. NO. 92-248 (1971), reprinted in 1971 U.S.C.C.A.N. 1333, 1335. The same report explains, preemption of conflicting state law is necessary to "assure[] that manufacture for the domestic trade will not involve compliance with widely varying local requirements." S. REP. NO. 92-248, 1971 U.S.C.C.A.N. at 1341.

In accordance with this purpose, section 4302 of the FBSA delegates to the Secretary of Transportation authority to "[establish] minimum safety standards for recreational vessels and associated equipment," including "requiring the installation, carrying, or use of associated equipment (including . . . ventilation systems . . . )." 46 U.S.C. § 4302(a)(1)-(2). The official notes of section 4302 emphasize that this delegation of authority grants the Secretary broad discretion to establish uniform safety standards:

> In lieu of establishing specific statutory safety requirements, subsection (a) provides flexible regulatory authority to establish uniform standards for the design, construction, materials, and performance of the boats themselves and all associated equipment. It also provides for the display of seals and other devices for certifying or evidencing compliance with applicable safety regulations or standards.

46 U.S.C. § 4302, historical and revision notes (emphasis added). Consistent with this flexible regulatory authority, the FBSA also grants the Secretary the discretionary power to exempt certain vessels from those same regulations: "If the Secretary considers that recreational vessel safety will not be adversely affected, the Secretary may issue an exemption from this chapter or a regulation prescribed under this chapter." 46 U.S.C. § 4305. Finally, section 4306 of the FBSA—titled "Federal preemption"—expressly provides that the regulatory scheme promulgated under the FBSA preempts inconsistent state law:

> Unless permitted by the Secretary under section 4305 of this title, a State or political subdivision of a State may not establish, continue in effect, or enforce a law or regulation establishing a recreational vessel or associated equipment performance or other safety standard or imposing a requirement for associated equipment (except insofar as the State or political subdivision may, in the absence of the Secretary's disapproval, regulate the carrying or use of marine safety articles to meet uniquely hazardous conditions or circumstances within the State) that is not identical to a regulation prescribed under section 4302 of this title.

46 U.S.C. § 4306 (emphasis added).

The Secretary of Transportation has delegated all regulatory authority under the FBSA to the Coast Guard. See Sprietsma, 537 U.S. at 57 (citing 49 C.F.R. § 1.46(n)(1) (1997)). It is a well-settled principle of preemption doctrine that "a federal agency acting within the scope of its congressionally delegated authority" is afforded the same preemptive power over state law as Congress. Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 369, 106 S. Ct. 1890, 90 L. Ed. 2d 36 (1986). Accordingly, "Coast Guard regulations are to be given pre-emptive effect over conflicting state laws." U.S. v. Locke, 529 U.S. 89, 109-10, 120 S. Ct. 1135 (2000). One regulation promulgated by the Coast Guard requires boats to be equipped with a ventilation system:

(a) Each compartment in a boat that has a permanently installed gasoline engine with a cranking motor must:

(1) Be open to the atmosphere, or

(2) Be ventilated by an exhaust blower system.

33 C.F.R. § 183.610. Since 1988, however, the Coast Guard has granted an official exemption to Bombardier for personal watercraft due to their unique design. The Coast Guard's Grant of Exemption number CGB 88-001, entitled "In the matter of the petition of BOMBARDIER CORPORATION for an exemption from [33 C.F.R. § 183.610]," considers several different regulatory requirements as they relate to personal watercraft. CP at 677-80. Regarding ventilation, the Coast Guard concluded an exemption would not adversely affect boating safety:

> The present ventilation regulations in Subpart K of Part 183 [33 C.F.R. § 183.610] were intended to apply to conventional types of boats powered by inboard or sterndrive engines or equipped with generators. These engines may emit gasoline fuel vapors. The ventilation regulations are intended to remove such vapors; however, the fuel system on the "Sea-Doo" boat is not designed in the same way as a fuel system on a conventional inboard or sterndrive. The fuel system is sealed to prevent leakage when the boat is oriented in any position. As a result, compliance with the requirements of Section 183.610 is unnecessary to achieve an acceptable level of safety.

> In consideration of the foregoing, I find that to grant this exemption would not adversely affect boating safety. Therefore, pursuant to the authority contained in 46 U.S.C. 4305 and 49 CFR 1.46(n)(1), which authority has been delegated to me by the Commandant, and exemption from the requirements of [33 C.F.R. § 183.610] is hereby granted to the Bombardier Corporation . . . .

CP at 679 (emphasis added). In light of this exemption, the Coast Guard required Bombardier to affix labels to its personal watercraft models alerting consumers to the exemption:

Each "Sea-Doo" boat, in lieu of a certification label, shall have permanently affixed to it, in a location clearly visible to the operator when boarding the boat or getting the boat underway, a label which contains the following information:

. . . .

(b) The words:

"THIS BOAT IS NOT REQUIRED TO COMPLY WITH THE FOLLOWING U.S. COAST GUARD SAFETY STANDARDS IN EFFECT ON (insert date of certification or the words 'THE DATE OF CERTIFICATION'):

- Display of Capacity Information
- Safe Loading
- Flotation
- Fuel System
- Powered Ventilation

AS AUTHORIZED BY U.S. COAST GUARD GRANT OF EXEMPTION (CGB 88-001)."

CP at 680 (emphasis added). The record includes a photograph of this label affixed to a jet ski identical to the one involved in the accident underlying Rollins' lawsuit. The Coast Guard has exempted nearly all personal watercraft manufacturers, including Bombardier, from complying with the ventilation requirement under 33 C.F.R. § 183.610(a)(1)-(2).

Federal courts have found conflict preemption when a common law claim imposes a requirement that is inconsistent with federal safety standards. For instance, in Gracia v. Volvo Europa Truck, N.V., 112 F.3d 299 (7th Cir. 1997), the court explained that allowing the plaintiff's design defect claim to continue would defeat the federal government's goal of maintaining uniform safety standards across the country:

The Safety Act, in order that it might achieve its primary purpose of reducing traffic injuries and fatalities, also had the objective of establishing uniform national safety standards and adequate enforcement of those standards, as the legislative history indicates. We agree that when a state

> requirement is not identical to the federal standard it would obviously impede the objective of uniform national standards . . . .
>
> If Gracia's common law claim was not preempted, then manufacturers would be placed in a position where they could be subject to varying standards from state to state, which could not all be complied with simultaneously. For instance, one state's common law could require stringent windshield retention, while another state's could require that windshields not be permanently affixed. If this were the case, then the manufacturer would be subject to liability if the windshield were ejected in an accident in one state, but in another state would be liable if a windshield remained intact and a trapped victim were unable to escape from the vehicle.

Gracia, 112 F.3d at 298.

The same reasoning applies here. In Becker v. U.S. Marine Co., 88 Wn. App. 103, 943 P.2d 700 (1997), we stated that "[a] tort claim defeats the purposes of the [FBSA] and is therefore preempted only when the duty asserted conflicts with the Coast Guard's explicit decision either to adopt a particular standard or to leave the feature or structure unregulated." Becker, 88 Wn. App. at 111. Because Rollins' claim directly conflicts with an exemption granted by the Coast Guard acting within the scope of its congressionally delegated authority, it is preempted. The FBSA grants authority to the Secretary of Transportation to promulgate boat safety regulations and exempt individual manufacturers or boat models from those same regulations. Together, these regulations and exemptions create a framework of safety standards intended to encourage uniformity among the states and protect manufacturers from "widely varying local requirements." S. REP. NO. 92-248, 1971 U.S.C.C.A.N. at 134; see also Sprietsma, 537 U.S. at 57. With these goals in mind, the act provides that standards promulgated under the act preempt conflicting state laws.

Pursuant to this regulatory authority, the Coast Guard granted Bombardier an official exemption from the ventilation requirement for its Sea-Doo model jet skis. The parties agree that the thrust of Rollins' design defect claim is that the jet ski lacked a ventilation system. Because her claim effectively "impos[es] a requirement" that is inconsistent with the federal safety standard, it creates an obstacle to the FBSA's purpose and is therefore preempted. 46 U.S.C. § 4306 ("[A] State or political subdivision of a State may not . . . impos[e] a requirement . . . that is not identical to a regulation prescribed under section 4302 of this title." (emphasis added)); see Gade, 505 U.S. at 98 ("conflict preemption [occurs] where . . . state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"). Like in Gracia, if Rollins' "common law claim was not preempted, then manufacturers would be placed in a position where they could be subject to varying standards from state to state," thereby negating the Coast Guard's authority to grant exemptions under 46 U.S.C. § 4306 and impeding the purposes underlying the FBSA. Gracia, 112 F.3d at 298.[2]

### The Coast Guard's Exemption Letter

Rollins argues her claim is not preempted because the Coast Guard's Grant of Exemption is not a "regulation." Rollins asserts that the FBSA preempts state laws only

---

[2] For similar reasons, the Coast Guard's exemption cannot be viewed as a "minimum standard" upon which a state may place more stringent requirements. Rollins argues that the exemption does not conflict with her product liability claim because the exemption does not prohibit ventilation systems; it merely does not require them. Therefore, a manufacturer could include a ventilation system without violating any federal regulation. But, as explained in Gracia and Becker, exposing a manufacturer in compliance with federal standards to state common law liability defeats the purpose underlying those standards.

when those laws are "not identical to a regulation prescribed under section 4302 of this title." 46 U.S.C. § 4306 (emphasis added). Because the Coast Guard's Grant of Exemption is "a mere letter," and not a "regulation," it has no preemptive authority under the FBSA. Br. of Appellant at 1. The key difference, according to Rollins, is that the content of the Coast Guard's Grant of Exemption was never published in either the Code of Federal Regulations or the Federal Register. To support this argument, Rollins cites Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533 (D.C. Cir. 1986):

> Failure to publish in the Federal Register is indication that the statement in question was not meant to be a regulation, since the Administrative Procedure Act requires regulations to be so published . . . . The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents "having general applicability and legal effect."

Brock, 796 F.2d at 538-39 (quoting 44 U.S.C. § 1510 (1982)). In other words, Rollins argues her claim is not preempted because there is no "law" or "regulation" preempting the claim.

We are not persuaded by Rollins' attempt to cast the exemption letter as a "mere letter" lacking any preemptive effect. Rollins' argument elevates form over substance. She fails to cite any authority stating that only published regulations have preemptive force. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). Indeed, preemption does not typically depend on whether a regulation is published. Rather, it is the "purpose of Congress" that is "the ultimate touchstone of pre-emption analysis." Cipollone, 505 U.S. at 517. Accordingly, federal courts have

-12-

acknowledged that "federal agency action taken pursuant to statutorily granted authority short of formal, notice and comment rulemaking may also have preemptive effect over state law." Fellner v. Tri-Union Seafoods, LLC, 539 F.3d 237, 244 (3d Cir. 2008); see also Colacicco v. Apotex Inc., 521 F.3d 253, 271 (3d Cir. 2008) ("Although preemption is commonly thought of in terms of statutes and regulations, a federal agency's action taken pursuant to statutorily granted authority may also have preemptive effect over state law."). The FBSA evidences Congress' clear intent to grant the Secretary of Transportation (and, by extension, the Coast Guard) broad regulatory authority to establish uniform safety standards that supersede conflicting state requirements. In Gracia, 112 F.3d at 291, the court explained that federal action can have preemptive force even if it involves no regulation. In Gracia, the National Highway Transportation Safety Administration (NHTSA) established windshield retention requirements and exemptions for certain vehicles pursuant to its authority under the National Traffic and Motor Vehicle Safety Act (NTMVSA). Gracia, 112 F.3d at 297. The court stated that this framework amounted to a federal standard with preemptive force:

> [H]ere there is a specific federal standard addressing windshield retention for the truck at issue, in which the NHTSA determined that this type of vehicle should be exempt from the affixing requirement. The Supreme Court has held that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate." Arkansas Elec. Co-op Corp. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 384, 103 S. Ct. 1905, 1912, 76 L. Ed. 2d 1 (1983) . . . Therefore, the existence of the exclusionary language in the federal safety standard mandates that we interpret it as representing a conscious decision by the NHTSA. An examination of the legislative history further bolsters that it was the intent of the NHTSA to exclude trucks such as the one at issue in this case from having to meet any windshield retention requirements.

Gracia, 112 F.3d 296-97. In Gracia, it was irrelevant whether or not the exemptions at issue had been published.[3] Instead, the court considered whether those exemptions demonstrated a "conscious decision" by the agency to develop a federal safety standard. Gracia, 112 F.3d at 297.

We acknowledged the same principle in Becker. The plaintiff in Becker filed a product liability claim against a boat manufacturer alleging the manufacturer negligently caused injury by failing to include certain safety features such as handrails on one of its boat models. Becker, 88 Wn. App. at 104-05. The Coast Guard had never promulgated any regulation or exemption related to handrails. Becker, 88 Wn. App. at 110. But despite any formal law or regulation, we stated that preemption may nevertheless exist if there was sufficient evidence that the Coast Guard had considered and rejected regulations addressing handrails: "[t]he issue in this case, therefore, is a factual one: has the Coast Guard explicitly considered and rejected regulation in matters of handrails and bow seating design?" Becker, 88 Wn. App. at 111. This key inquiry would have been unnecessary if, as Rollins contends, a federal agency's action must be a formally published law or regulation to have preemptive effect. Instead, we considered whether the Coast Guard had made an "explicit decision to either to adopt a particular standard or to leave the feature or structure unregulated." Becker, 88 Wn. App. at 111. We ultimately held the plaintiff's tort claim was not preempted "[b]ecause

_____

[3] The exemptions at issue in Gracia had, in fact, been published in the Code of Federal Regulations. However, as Bombardier notes, this is simply due to a key difference between the FBSA and the NTMVSA. The latter requires exemptions to be published while the former does not. Compare 49 U.S.C. § 30113, § 30114 with 46 U.S.C. § 4305.

the Coast Guard has not formally considered, evaluated, and rejected regulation of bow seating design, including handrails . . . ." Becker, 88 Wn. App. at 112.

Here, unlike in Becker, the Coast Guard's exemption letter provides strong evidence of "explicit decision either to adopt a particular standard or to leave the feature or structure unregulated." Becker, 88 Wn. App. at 111. Despite Rollins' assertion that the Coast Guard's Grant of Exemption is a "mere letter," the record shows the Coast Guard grants such exemptions through formal exemption procedures only after conducting a rigorous evaluation process. Scott Evans, retired Captain and former Chief of Office of Boating Safety of the U.S. Coast Guard, explained the exemption process in a declaration submitted to the trial court. The exemption procedure is also summarized in the Coast Guard's 1999 Federal Register.

To obtain an exemption, a manufacturer such as Bombardier must first send a petition to the Coast Guard's Product Assurance Division. The petition must describe the boat or vessel for which the exemption is being sought and include detailed design information and specifications. The petition must also provide data and argument explaining why the vessel should receive an exemption from a specific Coast Guard regulation and why the exemption would not adversely affect boating safety. After receiving the petition, engineers in the Product Assurance Division critically and independently review the product designs in comparison with federal standards relevant to the specific exemption request. The engineers work closely with the Division Chief throughout the review process, and the Division Chief reports to the Chief of the Office of Boating Safety regarding the status of the exemption request on at least a weekly basis. The Product Assurance Division also consult closely with outside organizations,

such as the American Boating and Yacht Council, Society of Automotive Engineers, National Fire Protection Association, and Underwriters' Laboratories.

During this extensive review process, the Coast Guard works closely with manufacturers to ensure that relevant designs met or exceeded federal requirements. Under the FBSA, the Coast Guard may only grant an exemption if it determines that the exemption will not adversely affect boat safety. Once the Product Assurance Division determines that the exemption would not adversely affect boat safety, the exemption request would be vetted through the Chief of the Officer of Boating Safety. Once the exemption is granted, it "constitute[s] official Coast Guard regulatory action done pursuant to . . . Congressional authority." CP at 1755; see 46 U.S.C. § 4305. This exemption process has remained the same since 1988. In 1999, the Coast Guard proposed changing the exemption process. The Coast Guard published a description of the exemption process in the Federal Register and sought public comments on certain aspects of the process.[4] But the Coast Guard ultimately left the same procedure in place.

Under these circumstances, the Coast Guard's Grant of Exemption preempts Rollins' claim. Unlike in Becker and Sprietsma, where the record failed to establish that

---

[4] "On May 19, 1998, the National Transportation Safety Board (NTSB) issued a report that recommended the Coast Guard eliminate the existing process of exempting personal watercraft from the regulations in 33 CFR Parts 181 and 183 and develop safety standards specific to personal watercraft." CP at 1748. Examples of alternate types of regulations were suggested and public comments solicited: "(1) requiring that PWC manufacturers meet prescribed industry design standards . . . , or (2) developing manufacturing regulations that address accidents associated with the specific design of the PWC." CP at 1748.

the Coast Guard had explicitly considered and rejected the regulation at issue,[5] the Coast Guard's Grant of Exemption here shows an unambiguous decision to exempt personal watercraft from the general ventilation requirement under 33 C.F.R. § 183.610. Further, the preemptive power of the FBSA does not derive solely from individual regulations published in the C.F.R., as Rollins contends. The statute grants the Coast Guard flexible authority to create a uniform standard through a framework of regulations and exemptions.[6] Because the Coast Guard's power to grant exemptions flows from a federal statute that expressly delegates authority to develop boat safety standards that supersede conflicting state requirements, the exemption has preemptive force.

The authority Rollins cites is inapposite. She concedes that Brock—the primary case upon which she relies—has nothing to do with preemption doctrine. In Brock, the court addressed whether the Secretary of Labor's enforcement policy promulgated under the Federal Mine Safety and Health Act was a "binding norm" or simply a statement of general policy. Brock, 796 F.2d at 536. The court concluded that the enforcement policy did not constitute a "binding, substantive regulation" because the "language of the guidelines is replete with indications that the Secretary retained his discretion to cite production-operators as he saw fit." Brock, 796 F.2d at 538. In dicta,

---

[5] See Sprietsma, 537 U.S. at 67 ("The Coast Guard did not take the further step of deciding that, as a matter of policy, the States and their political subdivisions should not impose some version of propeller guard regulation, and it most definitely did not reject propeller guards as unsafe . . . . Thus, although the Coast Guard's decision not to require propeller guards was undoubtedly intentional and carefully considered, it does not convey an 'authoritative' message of a federal policy against propeller guards." (emphasis added)).

[6] Since 1972, the Coast Guard has granted exemptions from the regulations to certain other non-conventional boats including personal watercraft, air boats, hovercraft, submarines, drift boats, race boats, and mini bass boats.

the court explained that the enforcement policy was not a binding regulation even though it was published in the Federal Register: "Publication in the Federal Register does not suggest that the matter published was meant to be a regulation." Brock, 796 F.2d at 539. The court stated that typically a regulation must be published in the Code of Federal Regulations to have legal effect. Brock, 796 F.2d at 539.

The legal question in Brock is entirely unrelated to the issue here. The Brock court analyzed the difference between regulations and general statements of policy, not whether either of those agency actions have preemptive force. As discussed above, both federal and Washington courts have acknowledged that an agency action may preempt state law even if there is no formal, published regulation. See Fellner, 539 F.3d at 244; see also Becker, 88 Wn. App. at 111.[7]

Rollins also relies on Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d 445 (7th Cir. 1990). The Wabash court concluded that the Rural Electrification Administration (REA) could not preempt state law with a letter, stating that instead it "must establish rules with the force of law." Wabash, 903 F.2d at 453-54. There are several key differences between the letter at issue in Wabash and the Coast Guard's Grant of Exemption at issue here. First, in the letter, the REA sought to exercise control over Wabash's electricity rates. Wabash, 903 F.2d at 450. The REA failed to show it had any legal authority to do so: "[n]either REA's letter to Wabash nor

---

[7] We also note that accepting Rollins' argument under Brock—that the Coast Guard's "letter" is not a "regulation"—leads to an absurd result. If Rollins is correct that Brock controls, the Coast Guard's Grant of Exemption not only lacks preemptive force, it lacks any legal authority at all. See Brock, 796 F.2d at 539 (Regulations must be published in the Code of Federal Regulations to have "legal effect."). If that is the case, then Bombardier and other manufacturers have been designing and selling personal watercraft without ventilation systems in violation of 33 C.F.R. § 183.610 since 1988.

its brief in this court cites any provision of the statute allowing it to regulate the rates charged by its borrowers. Unless the REA has this authority, it is hard to see how it can preempt state law . . . ." Wabash, 903 F.2d at 453. Second, the court criticized the REA's letter as an "informal procedure" lacking legal force. Wabash, 903 F.2d at 454. Here, in contrast, the Coast Guard unquestionably possesses the authority to grant exemptions from boat safety regulations. 45 U.S.C. § 4306. As discussed above, the Grant of Exemption letter is the product of a rigorous evaluation procedure distinct from the informal letter at issue in Wabash.

### The Savings Clause

Rollins also claims that the saving clause in the FBSA saves her state law claim from preemption. The saving clause provides that "[c]ompliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." 46 U.S.C. § 4311. In Sprietsma, the court concluded the FBSA did not preempt a state product liability claim in part because of the saving clause:

> [T]he "saving clause assumes that there are some significant number of common-law liability cases to save [and t]he language of the pre-emption provision permits a narrow reading that excludes common-law actions."
> The contrast between its general reference to "liability at common law" and the more specific and detailed description of what is pre-empted by § 10 . . . indicates that § 10 was drafted to pre-empt performance standards and equipment requirements imposed by statute or regulation.
> Indeed, compensation is the manifest object of the saving clause, which focuses not on state authority to regulate, but on preserving "liability at common law or under State law." In context, this phrase surely refers to private damage remedies. We thus agree . . that petitioner's common-law tort claims are not expressly pre-empted by the FBSA.

Sprietsma, 537 U.S. at 6364. At the same time, however, the court recognized that the FBSA would preempt a state common law claim despite the saving clause if that claim directly conflicted with regulations. Sprietsma, 537 U.S. at 65 ("Of course, if a state common-law claim directly conflicted with a federal regulation promulgated under the [FBSA], or if it were impossible to comply with any such regulation without incurring liability under state common law, pre-emption would occur." (Emphasis added)).

Indeed, both federal and Washington courts have recognized that saving clauses like the one in section 4311 protect only those tort claims outside the scope of federal regulation. In Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000), the court explained that saving clauses do not broadly protect tort claims, but rather prevent manufacturers from using compliance with federal regulation as a general defense to tort liability:

> Nothing in the language of the saving clause suggests an intent to save state-law tort actions that conflict with federal regulations. The words [in the clause] sound as if they simply bar a special kind of defense, namely, a defense that compliance with federal standard automatically exempts a defendant from state law . . . . It is difficult to understand why Congress would have insisted on a compliance-with-federal-regulation precondition to the provision's applicability had it wished the Act to "save" all state-law tort actions, regardless of their potential threat to the objectives of federal safety standards promulgated under that Act. Nor does out interpretation conflict with the purpose of the saving provision, say, by rendering it ineffectual. As we have previously explained, the saving provision still makes clear that the express pre-emption provision does not of its own force pre-empt common-law tort actions . . . .
> Moreover, this Court has repeatedly "decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law."

Geier, 529 U.S. at 869-70 (quoting United States v. Locke, 529 U.S. 89, 106-07, 120 S. Ct. 1135 (2000)). Indeed, the Senate report for the FBSA confirms that the purpose of

the saving clause is to prevent defendants from using compliance with federal regulations as a broad defense to tort claims. See Becker, 88 Wn. App. at 108 ("According to the same Senate report, the purpose of the savings clause is 'to assure that in a product liability suit mere compliance by a manufacturer with the minimum standards promulgated under the Act will not be a complete defense to liability.'" (quoting S. REP. 92-248 § 40 (1971), 1971 U.S.C.C.A.N. at 1352)). With this understanding of the saving clause, we held that "[a] tort claim defeats the purposes of the [FBSA] and is therefore preempted only when the duty asserted conflicts with the Coast Guard's explicit decision either to adopt a particular standard or to leave the feature or structure unregulated." Becker, 88 Wn. App. at 111.

Unlike this case, the tort claim in Sprietsma was saved from preemption because it targeted an area that the Coast Guard had not regulated. The plaintiff in Sprietsma filed a product liability claim when his wife died after being struck by the propeller of a boat manufactured by Mercury Marine. Sprietsma, 537 U.S. at 54. The plaintiff alleged the boat was not equipped with a propeller guard. Sprietsma, 537 U.S. at 55. Although the Coast Guard had considered promulgating a standard for propeller guards, it ultimately did not impose any propeller guard regulation due to "the lack of any 'universally acceptable' propeller guard for 'all modes of boat operation.'" Sprietsma, 537 U.S. at 67. Therefore, "although the Coast Guard's decision not to require propeller guards was undoubtedly intentional and carefully considered, it does not convey an 'authoritative' message of a federal policy against propeller guards." Sprietsma, 537 U.S. at 67.

Here, in contrast, the Coast Guard has promulgated a uniform standard for exhaust ventilation. 33 C.F.R. § 183.610 establishes a general requirement for ventilation systems, and the Coast Guard has granted personal watercraft an exemption to this requirement due to their unique design. Preemption did not foreclose the tort claim in Sprietsma because the Coast Guard never conveyed an "authoritative message" to either regulate boat propellers or that boat propellers were unnecessary. Sprietsma, 537 U.S. at 67. Because the Coast Guard had imposed no regulation at all, the tort claim could proceed. Rollins' claim, however, directly conflicts with "the Coast Guard's explicit decision . . . to adopt a particular standard" regarding ventilation systems. Becker, 88 Wn. App. at 111. Thus, her claim "defeats the purposes of the [FBSA] and is therefore preempted." Becker, 88 Wn. App. at 111.

Rollins nevertheless argues her claim is not preempted because the regulation at issue presented Bombardier with a choice to use ventilation systems or not. In Williamson v. Mazda Motor of Am. Inc., 562 U.S. 323, 131 S. Ct. 1131, 179 L. Ed. 2d 75 (2011), the court analyzed a regulation under the National Traffic and Motor Vehicle Safety Act which allowed manufacturers a choice as to what type of seat belt—either lap belts or lap-and-shoulder belts—to install in rear middle seats. Williamson, 562 U.S. at 326-27. The plaintiff's tort claim alleged that Mazda should have installed lap-and-shoulder belts rather than just lap belts. Williamson, 562 U.S. at 327. The court held that when a regulation offers a manufacturer a choice, that regulation does not preempt state law claims based on a manufacturer's choice if providing that choice is not central to federal regulatory objectives. Williamson, 562 U.S. at 336.

Williamson is inapposite for several reasons. First, Rollins' reliance on Williamson is a recasting of her previous argument that because the exemption does not prohibit ventilation systems Bombardier could nevertheless include a ventilation system without violating the Coast Guard's regulatory scheme. However, as discussed above, imposing additional requirements via tort liability defeats the Coast Guard's statutory authority to grant exemptions and creates an obstacle to federal regulatory objectives. See Gracia, 112 F.3d at 298 ("If Gracia's common law claim was not preempted, then manufacturers would be placed in a position where they could be subject to varying standards from state to state, which could not all be complied with simultaneously."); see also Becker, 88 Wn. App. at 111 ("A tort claim defeats the purposes of the [FBSA] and is therefore preempted only when the duty asserted conflicts with the Coast Guard's explicit decision either to adopt a particular standard or to leave the feature or structure unregulated.").

Second, the Bombardier's exemption does not provide the same "choice" available to manufacturers in Williamson. In 1999, the Coast Guard published an explanation of the exemption process in the Federal Register. The Coast Guard stated that once a boat model is subject to an exemption, the manufacturer cannot change the design of that model without petitioning for an amendment to the exemption:

> If the manufacturer changes the design or construction of a boat subject to the provisions of an exemption . . . the manufacturer must petition the Coast Guard for an amendment to the provisions of the grant of exemption.

CP at 1748 (64 Fed. Reg. 201 (October 19, 1999)). Therefore, once Bombardier obtained the exemption for its Sea-Doo model, it could not alter the model without petitioning for an amendment to the exemption.

Further, the Coast Guard's ventilation regulation does grant manufacturers a choice, but Bombardier's Grant of Exemption exempts it from having to make that choice. The Coast Guard requires that every boat with a gasoline crank motor achieve ventilation by either (1) exposing the engine compartment to the open air or (2) equipping the model with an exhaust blower system. Manufacturers have the choice of which ventilation method to use. Bombardier's Grant of Exemption, however, allows it to avoid making this choice in the first place. Rollins' theory under Williamson would potentially allow a tort suit against a manufacturer who, for instance, chose to use an "open air" model rather than an exhaust blower model. It does not allow Rollins to sue a manufacturer who is exempt from the regulation altogether.

### CONCLUSION[8]

Because Rollins' product liability claim directly conflicts with explicit, uniform safety standards promulgated by the Coast Guard acting within the scope of its congressionally delegated authority, it is preempted.

---

[8] Given the trial court's findings, we are troubled by the alternative claims of impropriety alleged by Bombardier premised on State Farm's settlement conduct. But we decline to address those assertions here based on an incomplete record.

We affirm the order dismissing Rollins' product liability claim on summary judgment.[9]

WE CONCUR:

---

[9] Because we conclude that Rollins' claim is barred by conflict preemption, we need not address the alternative theories of express preemption or field preemption.