# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| P.E.L.; and P.L. and J.L, a married couple and parents of P.E.L., | No. 82800-2-I |
| Appellants, | |
| v. | PUBLISHED OPINION |
| PREMERA BLUE CROSS, | |
| Respondent. | |

BOWMAN, J. — Fifteen-year-old P.E.L. attended a residential wilderness program for mental health treatment through Evoke Therapy Programs. P.E.L.'s health insurer Premera Blue Cross denied coverage for P.E.L. because her policy excludes wilderness programs as nontreatment. P.E.L. sued Premera, claiming it breached its contract by not complying with the Washington State mental health parity act (WPA), RCW 48.44.341, and the federal parity act (FPA), 29 U.S.C. § 1185a, in violation of the Patient Protection Affordable Care Act (ACA), 42 U.S.C. § 300gg-26, and the state Consumer Protection Act (CPA), chapter 19.86 RCW. P.E.L. also sued for insurance bad faith and negligence. The trial court dismissed P.E.L.'s claims on summary judgment. P.E.L. appeals, arguing the trial court erred by granting Premera's motions for summary judgment. We conclude that the trial court erred because genuine issues of material fact remain as to whether Premera's exclusion of wilderness programs is a separate treatment limitation that applies to only mental health services. The

No. 82800-2-I/2

trial court also erred by dismissing P.E.L.'s insurance bad faith claim for failure to show objective symptomatology of emotional distress.  We otherwise affirm.  We reverse in part and remand.

FACTS

In 2016, P.L. and J.L bought health insurance under Premera's "Premera Blue Cross Preferred Gold 1000" plan (Plan) from the Washington Health Benefit Exchange.  The Plan also covered their then-15-year-old daughter P.E.L., who was diagnosed with major depressive disorder, anxiety disorder, and post-traumatic stress disorder.  The Plan covered some mental health services such as "[i]npatient, residential treatment," "outpatient care to manage or reduce the effects of the mental condition," and "[i]ndividual or group therapy."  But it excluded others, including "[o]utward bound, wilderness, camping or tall ship programs or activities."  The Plan also excluded coverage for nontreatment facilities, or facilities such as prisons or nursing homes "that do not provide medical or behavioral health treatment for covered conditions from licensed providers," but it did cover "medically necessary medical or behavioral health treatment received in th[o]se locations."

In February 2016, P.E.L. was hospitalized for acute suicidal ideation. After the hospital released her to her parents, P.L. and J.L. sent P.E.L. to Evoke in Bend, Oregon, for treatment.  The therapy programs at Evoke included a wilderness program licensed as an "outdoor youth program" and "child caring agency."  Evoke describes the program as "a licensed adolescent treatment program that utilizes the experiential opportunities of a wilderness setting with a

2

No. 82800-2-I/3

clinically focused intervention."[1]  Evoke holds its wilderness participants to a structured schedule—they must complete daily chores and learn skills like fire making, shelter building, and food preparation.  Trained field instructors supervise the participants and licensed mental health therapists meet with them twice a week.  And they participate in team building activities and psychoeducational groups to learn healthy development and relationship management, assertive communication, problem solving, empathy, and awareness building.  P.E.L. stayed at Evoke for 63 days from April 27 to June 28, 2016, where she "displayed significant progress . . . over time."

In July 2016, Evoke billed Premera for P.E.L.'s stay.  In September, Premera denied the claim, stating, "Our medical staff reviewed this claim and determined this service is not covered by your [P]lan."  P.E.L. submitted an internal appeal, arguing Premera's decision violated the WPA and FPA. Premera denied the appeal and upheld its denial of coverage.  It explained that the "decision was made based on [P.E.L.]'s [P]lan language, which specifically excludes coverage for outward bound, wilderness, camping or tall ship programs or activities."  It determined the exclusion complies with the FPA because the Plan "excludes wilderness programs for both mental health conditions and medical conditions."  Premera later explained that it excludes wilderness

---

[1] The Association for Experiential Education accredited Evoke for "Outdoor Behavioral Healthcare."

No. 82800-2-I/4

programs under the Plan as a nontreatment facility.[2]

P.E.L. requested review by an independent review organization (IRO).[3] She argued that the clinical efficacy of programs like Evoke are "supported by evidence published in peer-reviewed journals," and that Premera must cover the service to comply with the FPA.[4] The IRO upheld Premera's determination that the Plan did not cover P.E.L.'s stay at Evoke. It also determined the exclusion "does not clearly violate" the FPA.

P.E.L. and her parents (collectively P.E.L.) sued Premera. She asserted claims of breach of contract and failure to comply with the WPA and FPA in violation of the ACA and CPA, insurance bad faith under RCW 48.01.030, and negligent claims management. In November 2020, the parties cross moved for summary judgment. The court granted Premera's motion in part, dismissing P.E.L.'s WPA related claims with prejudice. In May 2021, the parties again cross moved for summary judgment. The court granted Premera's motion and dismissed the rest of P.E.L.'s claims with prejudice.

P.E.L. appeals.

---

[2] Because the Plan covered medically necessary treatment received at nontreatment facilities, Premera agreed to cover "the 17 therapy sessions that P.E.L. received during her 63 days at Evoke." But P.E.L. did not submit claims for the therapy sessions.

[3] An IRO is an outside "organization of medical and contract experts qualified to conduct an independent review of member appeals."

[4] P.E.L. also pointed to a decision by an IRO in Oregon that concluded the program at Evoke is a medically necessary service.

4

No. 82800-2-I/5

ANALYSIS

P.E.L. argues the trial court erred by granting Premera's motions for summary judgment.

We review rulings on summary judgment de novo, performing the same inquiry as the trial court. Kruse v. Hemp, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

The moving party "has the initial burden to show there is no genuine issue of material fact." Zonnebloem, LLC v. Blue Bay Holdings, LLC, 200 Wn. App. 178, 183, 401 P.3d 468 (2017). A moving defendant can meet this burden by establishing that there is a lack of evidence to support the plaintiff's claim. Id. Once the defendant has made such a showing, the burden shifts to the plaintiff to show a genuine issue of material fact. Id. Summary judgment is appropriate if a plaintiff fails to show sufficient evidence to establish a question of fact as to the existence of an element on which the plaintiff will have the burden of proof at trial. Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co., 176 Wn. App. 168, 179, 313 P.3d 408 (2013). We consider all facts submitted and all reasonable inferences that we can draw from those facts in the light most favorable to the nonmoving party. Ellis v. City of Seattle, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000).

5

No. 82800-2-I/6

1. Breach of Contract

P.E.L. argues the trial court erred by granting summary judgment on her breach of contract claim because genuine issues of material fact remain about whether Premera breached its contract by not complying with the WPA and FPA in violation of the ACA when it denied coverage for her stay at Evoke.[5]  Premera argues that P.E.L. has no viable cause of action for breach of contract.  In the alternative, it maintains that its denial of coverage for wilderness programs complies with state and federal parity requirements.

A.  Viable Cause of Action

Premera argues that P.E.L. cannot sue for breach of contract alleging a violation of the ACA because the ACA affords no private cause of action.[6]  P.E.L. argues that she is not suing under the ACA to enforce compliance with the act.  Rather, she seeks only to enforce Premera's contractual promise that it would comply with the ACA through a common-law breach of contract claim.[7]  We agree with P.E.L.

Washington courts have not yet considered whether a party may bring a breach of contract claim to enforce the ACA.  But the United States District Court

---

[5] Amicus curiae Northwest Health Law Advocates filed a brief in support of P.E.L., arguing that if we do not allow breach of contract claims under a plan that promises to comply with state regulations and the ACA, we would leave individuals without recourse for mental health parity violations.

[6] See, e.g., A.Z. v. Regence Blueshield, 333 F. Supp. 3d 1069, 1083 (W.D. Wash. 2018) (the ACA "does not create a private right of action" to enforce the FPA).

[7] The ACA incorporated the FPA and expanded on it.  See Mental Health and Substance Use Disorder Parity Task Force, 81 Fed. Reg. 19013, 19015 (Mar. 29, 2016) (to be codified at 42 U.S.C. § 300gg-26) ("The Affordable Care Act builds on the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act to expand mental health and substance use disorder benefits and Federal parity protections for more than 60 million Americans.").

6

No. 82800-2-I/7

for the Northern District of Illinois addressed the issue in Briscoe v. Health Care Service Corp., 281 F. Supp. 3d 725 (2017). In that case, the court recognized that the ACA does not preempt consumers "from vindicating their rights under state contract law." Id. at 739. It determined that courts should "presume that states may continue regulating when Congress has not spoken to the contrary on an issue." Id. And "[g]iven the absence of any indication that Congress intended the ACA to preempt breach of contract claims," courts should permit plaintiffs to pursue claims to enforce a promise to comply with the ACA under the terms of a health plan.[8] Id.; see also R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 281, 773 A.2d 1132 (2001) (allowing state common-law breach of good faith and fair dealing claim even though claim rested on allegations of violation of the Fair Automobile Insurance Reform Act of 1990, chapter 17:33B-1 N.J. Statutes Annotated, and that act did not confer a private right of action). We conclude that the reasoning in Briscoe is sound, and we adopt it here.

> P.E.L.'s Plan provides that Premera
>
> will comply with the federal health care reform law, called the Affordable Care Act . . . . If Congress, federal or state regulators, or the courts make further changes or clarifications regarding the Affordable Care Act and its implementing regulations, including

---

[8] Not all jurisdictions agree with this approach. See, e.g., Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2nd Cir. 2003) (because "no private right of action exists under the [former Davis-Bacon Act, 40 U.S.C. § 276a (2002)], the plaintiffs efforts to bring their claims" for breach of contract "are clearly an impermissible 'end run' around the [statute]"); Fossen v. Caring for Montanans, Inc., 993 F. Supp. 2d 1254, 1265 (D. Mont. 2014) (where Montana's Small Employer Health Insurance Availability Act, Montana Code Annotated § 33-22-1801 (2009), provided no private right of action, claim that depended on incorporating the requirements of the statute was "merely another backdoor method of presenting an alleged violation of a statute that they have no right to enforce"), aff'd, 617 F. App'x 737 (9th Cir. 2015).

7

changes which become effective on the beginning of the calendar year, this plan will comply with them even if they are not stated in this booklet or if they conflict with statements made in this booklet.

Because Premera promised to follow the ACA under the terms of the Plan, P.E.L. can assert a common-law breach of contract claim to enforce that promise.

B.  Compliance with the Plan

To prevail on a breach of contract claim, a plaintiff must show that a contract exists, that the contract imposes a duty, that the defendant breached that duty, and that the breach proximately caused damage to the plaintiff.  Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995).  P.E.L. and Premera do not dispute that the Plan amounts to a contract and that Premera promised to comply with the ACA, FPA, and WPA.[9]  The sole issue here is whether Premera's refusal to cover P.E.L.'s treatment at Evoke breached its promise to comply with the ACA by violating the WPA and FPA.[10]

i.  Evolution of the WPA and FPA

Over the last 26 years, both the federal and our state legislatures have enacted laws aimed at improving parity for mental health services.  Congress first passed the Mental Health Parity Act of 1996, Title VII § 702 U.S.C., which prohibited large group plans from setting annual or lifetime dollar limits on mental

---

[9] The Plan does not explicitly promise to follow the WPA.  But Premera does not raise whether P.E.L. may bring a breach of contract claim to enforce that act, so we include it in our analysis.

[10] Amicus curiae Northwest Health Law Advocates also argues that Premera categorically excludes mental health treatment programs without conducting full parity and individualized medical necessity reviews in conflict with the legislative intent behind the ACA and state and federal parity laws.

No. 82800-2-I/9

health benefits lower than the limits for medical and surgical benefits. Pub. L. 104-204, 110 Stat. 2944 (1996).

In 2005, the Washington State Legislature created the WPA, its own parity act to expand coverage for mental health treatment. LAWS OF 2005, ch. 6, § 4; O.S.T. v. Regence BlueShield, 181 Wn.2d 691, 697, 335 P.3d 416 (2014); see RCW 48.44.341. The WPA provided that all health benefit plans that cover medical and surgical services must also cover comparable "[m]ental health services." Former RCW 48.44.341(2)(a)(i), (b)(i), (c)(i) (2005). The WPA defined "mental health services" as "medically necessary outpatient and inpatient services provided to treat mental disorders covered by the diagnostic categories listed in the most current version of the diagnostic and statistical manual of mental disorders." Former RCW 48.44.341(1). But it excluded "residential treatment" from its definition of "mental health services." Former RCW 48.44.341(1)(c).[11]

In 2008, Congress enacted the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Title V § 512 U.S.C., " 'to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans.' " Pub. L. 110-343, 122 Stat. 3881, 3892 (2008); Michael D. v. Anthem Health Plans of Ky., Inc., 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (quoting Am. Psychiatric Ass'n v. Anthem

---

[11] Effective January 1, 2021, the legislature removed the residential treatment exception from its definition of "mental health services." SUBSTITUTE H.B. 2338, 66th Leg., Reg. Sess. (Wash. 2020); see RCW 48.44.341(1)(b).

No. 82800-2-I/10

Health Plans, Inc., 821 F.3d 352, 356 (2d Cir. 2016)).  The act amended the FPA to require group health plans to cover mental health services at parity with medical and surgical services.  Former 29 U.S.C. § 1185a(a)(3) (2008).

Then, in 2010, the ACA expanded the FPA to individual insurance markets, not just group health plans.  Pub. L. 111-148, 124 Stat. 119 (2010) (substituting the language "or health insurance coverage offered in connection with such a plan" with the language "or a health insurance issuer offering group or individual health insurance coverage"); see, e.g., 42 U.S.C. § 300gg-26(a)(1), (2), (3).  Now, all health insurance plans must cover mental health and medical services at parity.  The FPA includes "residential treatment" as a mental health service.  See 29 U.S.C. § 1185a.

### ii.  Compliance with the WPA

P.E.L. argues Premera violated WAC provisions that implement the WPA by excluding coverage of her mental health services at Evoke without first evaluating whether the treatment was "medically necessary."

Our legislature authorized the Office of the Insurance Commissioner (OIC) to make rules and regulations to implement and aid in its administration of the WPA.  RCW 48.02.060(3)(a), .062.  In 2014, the OIC developed and adopted rules[12] related to insurance coverage of mental health services.  Wash. St. Reg. (WSR) 14-23-057 (Nov. 17, 2014).  The OIC codified those rules in WAC 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 to -7120 (Subchapter K, "Mental Health and Substance Use Disorder").

---

[12] Under the Washington State Administrative Procedure Act, chapter 34.05 RCW.

10

No. 82800-2-I/11

P.E.L. argues Premera violated WAC 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 when it denied her claim for treatment at Evoke. That WAC provides that mental health services "may not be denied solely on the basis that it is part of a category of services or benefits that is excluded by the terms of the contract." WAC 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(2).[13] P.E.L. recognizes the WPA exempted residential treatment programs from the definition of "mental health services" at the time she filed her claim in 2016. See former RCW 48.44.341(1)(c) (2007).[14] And for the limited purpose of applying the WPA, the parties agree that Evoke is a form of residential treatment. But P.E.L. argues the WAC still applies to her claims for four reasons.

First, P.E.L. contends the WAC in existence when she made her claim defined "mental health services" to include residential treatment. In 2016, former WAC 284-43-130(22) (WSR 15-24-074) defined "mental health services" as "in-patient or out-patient treatment, partial hospitalization or out-patient treatment to manage or ameliorate the effects of a mental disorder listed in the Diagnostic and Statistical Manual (DSM) IV." But an administrative body cannot abrogate the definition of "mental health services" established by the legislature in the WPA. See, e.g., Littleton v. Whatcom County, 121 Wn. App. 108, 117, 86 P.3d 1253 (2004) (where legislature defined "solid waste," a statute that permitted the Department of Ecology to exempt certain items from the definition did not also authorize it to include new items in the legislature's definition). Because the

---

[13] We note the OIC amended this rule in 2020 and 2021. WSR 20-24-040 (Nov. 23, 2020); WSR 21-24-072 (Nov. 30, 2021). Because the amendments did not change the relevant language of the rule as it was in 2016, we cite the current WAC.

[14] For the remainder of this opinion, all citations to former RCW 48.44.341 are to the 2007 version, the statute in effect when P.E.L. filed her claim in 2016.

11

No. 82800-2-I/12

WPA defines "mental health services" and does not authorize the OIC to expand that definition, the definition in the WPA controls. See former RCW 48.44.341(1)(c).

Second, P.E.L. contends that the federal definition of "mental health services," which includes residential treatment, should apply to her claim because the OIC, which implements and enforces both WPA and FPA requirements, considered both regulatory schemes when enacting its rules. But P.E.L. offers no authority that an agency may alter a statutory provision because it must enforce both state and federal regulations. See RAP 10.3(a)(6) (appellate brief should contain citations to legal authority to support argument). If a party fails to support argument with citation to legal authority, we may presume none exists. Or. Mut. Ins. Co. v. Barton, 109 Wn. App. 405, 418, 36 P.3d 1065 (2001).

Third, P.E.L. argues that "if the [WPA] exempts residential treatment, but federal law applies to such services, federal law controls." P.E.L. seems to argue that the FPA preempts the WPA because it conflicts with the FPA. But " '[t]here is a strong presumption against preemption[,] and state laws are not superseded by federal law unless that is the clear and manifest purpose of Congress.' " Rollins v. Bombardier Recreational Prods, Inc., 191 Wn. App. 876, 884, 366 P.3d 33 (2015)[15] (quoting Stevedoring Servs. of Am., Inc. v. Eggert, 129 Wn.2d 17, 24, 914 P.2d 737 (1996)). Conflict preemption occurs only " 'where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes

---

[15] Internal quotation marks omitted.

12

and objectives of Congress.' " Id. at 883-84[16] (quoting Gade v. Nat'l Sold Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992)). P.E.L. offers no argument that Washington's exemption of residential treatment as a mental health service under the WPA makes compliance with the FPA impossible or prohibits the execution of Congress' full objectives. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996).

Fourth, P.E.L. argues that "Premera promised to follow the state regulations even if they conflicted with the literal terms of the policy." But we can reasonably interpret Premera's promise as only agreeing to comply with those state laws that apply. Because the WPA does not apply to residential treatment, Premera complied with the WPA and its implementing regulations.

The trial court properly granted summary judgment dismissing P.E.L.'s claim for breach of contract for failure to comply with the WPA.

### iii. Compliance with the FPA

P.E.L. argues that Premera's refusal to provide benefits for wilderness programs violates the FPA because the limitations used to exclude the program are more restrictive than those applied to equivalent medical benefits and the exclusion amounts to a separate treatment limitation applicable to only mental health benefits.

---

[16] Internal quotation marks omitted.

No. 82800-2-I/14

Under the FPA, insurers that offer a health plan that covers both medical and mental health benefits must ensure that

> the treatment limitations applicable to such mental health . . . benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan . . . and there are no separate treatment limitations that are applicable only with respect to mental health . . . benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii).[17]

### a. More Restrictive Limitation

P.E.L. argues that Premera applied a more restrictive treatment limitation to wilderness programs than it applied to comparable medical and surgical benefits. We disagree.

Treatment limitations can be either quantitative or nonquantitative. 45 C.F.R. § 146.136(a). Quantitative treatment limitations "are expressed numerically (such as 50 outpatient visits per year)," while nonquantitative treatment limitations (NQTLs) "otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 45 C.F.R. § 146.136(a). NQTLs include medical management standards limiting or excluding benefits based on medical necessity, medical appropriateness, or whether the treatment is experimental or

---

[17] The parties do not dispute that the Plan covers both medical and mental health benefits.

No. 82800-2-I/15

investigative.  45 C.F.R. § 146.136(c)(4)(ii)(A).[18]

Regulations establish six "classifications of benefits" used for determining compliance with the FPA:  (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs.  45 C.F.R. § 146.136(c)(2)(ii)(A).  If a plan provides a mental health service in a classification but imposes a quantitative limitation on benefits, the insurer must show that the same limitation applies to at least "two-thirds of all medical/surgical benefits in that classification."  45 C.F.R. § 146.136(c)(3)(i)(A).  But if a plan imposes a NQTL for mental health benefits in any classification, the insurer must show that

> under the terms of the plan . . . as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the [NQTL] to mental health . . . benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.

45 C.F.R. § 146.136(c)(4)(i).

---

[18] NQTLs also include:

(B)  Formulary design for prescription drugs;

(C)  For plans with multiple network tiers (such as preferred providers and participating providers), network tier design;

(D)  Standards for provider admission to participate in a network, including reimbursement rates;

(E)  Plan methods for determining usual, customary, and reasonable charges;

(F)  Refusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy protocols);

(G)  Exclusions based on failure to complete a course of treatment; and

(H)  Restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage.

45 C.F.R. § 146.136(c)(4)(ii).

15

No. 82800-2-I/16

Premera excludes wilderness programs as medically unnecessary nontreatment. The Plan defines "medically necessary services" as:

Services a physician, exercising prudent clinical judgment, would use with a patient to prevent, evaluate, diagnose or treat an illness or injury or its symptoms. These services must:

- Agree with generally accepted standards of medical practice

- Be clinically appropriate in type, frequency, extent, site and duration. . . . They must also be considered effective for the patient's illness, injury or disease

- Not be mostly for the convenience of the patient, physician, or other healthcare provider. They do not cost more than another service or series of services that are at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of that patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature. This published evidence is recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors.

The Plan excludes from coverage "[s]ervices and places of service that are not medically necessary." And it excludes as nontreatment "programs from facilities that do not provide medical or behavioral health treatment for covered conditions from licensed providers."[19]

The Plan shows a neutral policy for making medical necessity and nontreatment determinations. It explains:

Premera has developed or adopted guidelines and medical policies that outline clinical criteria used to make medical necessity

---

[19] But the Plan covers medically necessary medical or behavioral health treatment received in these locations.

16

> determinations.[20]  The criteria are reviewed annually and are
> updated as needed to ensure our determinations are consistent
> with current medical practice standards and follow national and
> regional norms.  Practicing community doctors are involved in the
> review and development of our internal criteria.

That provision applies generally to mental health and medical services.

Premera's 2017 NQTL disclosure statement aligns with the language in the Plan.  It explains:

> The [P]lan bases decisions to cover services on whether the
> service is generally accepted in the medical community as an
> effective medical treatment, the availability of scientific research
> addressing the service's medical efficacy, whether there are state
> licensing standards for providers of the service, whether there are
> generally accepted medical standards for evaluating medical
> necessity, and whether the service actually treats a medical or
> mental health . . . condition.  Services that do not meet these
> criteria are plan exclusions.

The disclosure says the same procedures "apply both to services to treat mental health . . . conditions and to services to treat medical and surgical conditions."

In operation, the uncontroverted testimony of psychiatrist Dr. Robert Small, Premera Blue Cross Assistant Medical Director of Behavioral Health, confirmed that "Premera uses the same approach for evaluating the reliability and clinical usefulness of clinical trials and studies for both mental health and medical/surgical services."  Dr. Small said Premera periodically reviews literature for both mental health and medical programs using the "Delfini Group model."  Under that model, a trained reviewer evaluates studies using "numerous" criteria, including (1) potential bias; (2) whether the study's makeup, including the number and selection of participants, demographics, randomization, and reporting is

---

[20] Premera directs its members to its website to view those guidelines and medical policies.

appropriately designed; (3) whether the study's design is appropriate for the research question being asked; (4) whether a confounding variable may account for the study's conclusion; (5) the amount of participant attrition; (6) whether the assessors are blinded; and (7) whether the study used an appropriate comparator to determine whether the suggested intervention made a recognizable difference.

As for wilderness programs specifically, Dr. Small testified that his first periodic review of their medical necessity was about 20 years ago, and his last review was "probably about a month" before his October 2020 deposition in this case. He said he reviews the two primary journals in psychiatry—the American Journal of Psychiatry and the Journal of the American Academy of Child & Adolescent Psychiatry. He also periodically reviews "POP Med"[21] for new literature. Across his reviews, Dr. Small said he considered "numerous studies that purportedly support wilderness programs" but found they "contained significant methodological flaws," including bias, inadequate study design, and unreliable reporting methods. So, Dr. Small repeatedly determined that under the Delfini Group model, "there is not sufficient credible scientific evidence that demonstrates that wilderness programs are an effective form of treatment."

P.E.L. argues that Premera "deviated from its procedures when it added the [Wilderness] Exclusion without conducting any formal review to determine whether Wilderness treatment was medically necessary or experimental and investigational." She claims Premera "never convened its Medical Policy

---

[21] See https://popmednet.org.

18

No. 82800-2-I/19

Committee to consider any aspect of wilderness programs" and made its determination based on only Dr. Small "occasionally and informally perus[ing] 'the literature' related to wilderness treatment."

But P.E.L. points to no provision in the Plan requiring Premera to convene its medical policy committee to determine whether it should exclude a service. To the contrary, Dr. Small testified that Premera's purpose for convening a medical policy committee is not to exclude services from coverage. Instead, Premera's medical policy committee convenes monthly to determine whether it should reclassify a service from "excluded" to "experimental or investigational." According to Dr. Small, Premera had already excluded wilderness programs from coverage when he arrived at Premera in 1997. And since then, he has not recommended a change in the status because the medical literature does not support Premera treating wilderness programs as experimental or investigational—that is, the literature "has not shown critical scientific evidence that wilderness programs are effective forms of treatment."

P.E.L also appears to claim that Premera violated the FPA because it failed to categorize wilderness programs under one of the six classifications of services that an insurer generally uses for determining compliance with the FPA before excluding it as nontreatment. See 45 C.F.R. § 146.136(c)(2)(ii)(A); see also 45 C.F.R. § 146.136(c)(4).

P.E.L. is correct that the record does not show Premera categorized wilderness programs in one of the six categories of services under 45 C.F.R. § 146.136(c)(2)(ii)(A). But the limitation at issue is an NQTL, so the analysis of

19

parity is different than that used for a quantitative limitation. As discussed above, an NQTL meets the parity requirement if under the terms of the health plan, the process used in applying the NQTL to mental health benefits is comparable to, and applied no more stringently than, the process used with respect to medical and surgical benefits in the classification. 45 C.F.R. § 146.136(c)(4)(i). Premera showed that the process it used to determine whether a mental health service is nontreatment is the same process it used to determine whether a medical service is nontreatment. So, no matter which category wilderness programs fall under, the process Premera used to determine whether it is nontreatment would be the same process used to determine whether medical services in the same category are nontreatment.

Even so, Premera provides several examples of analogous nontreatment medical services to show it does not apply its process more stringently to mental health services. For example, under the "Common Medical Services" and "Surgery Services" sections of the Plan, Premera covers inpatient and outpatient hospital services but excludes as nontreatment "[g]ym memberships or exercise classes and programs." Under "Mental Health Care" benefits, the Plan covers "[i]npatient, residential treatment and outpatient care to manage or reduce the effects of the mental condition" and "[i]ndividual or group therapy." But it does not cover "[o]utward bound, wilderness, camping or tall ship programs or activities." The NQTL disclosure statement provides the same information:

> Examples of excluded medical/surgical benefits are recreational and vocational therapy, exercise and maintenance-level programs, and gym and swim therapy. Examples of excluded mental health . . . benefits are wilderness programs (Outward Bound), equine

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

therapy, Tall Ships programs, therapeutic boarding schools, and therapeutic foster or group homes.

The trial court did not err by dismissing P.E.L.'s breach of contract claim alleging that Premera's wilderness exclusion violates the FPA as a treatment limitation applied more restrictively to mental health services than comparable medical and surgical services.

<u>b. Separate Treatment Limitation</u>

P.E.L. also argues that the trial court erred by dismissing her breach of contract claim because a genuine dispute of material fact remains as to whether Premera's exclusion of wilderness programs is a separate limitation that applies to only mental health services. We agree.

P.E.L. claims that Premera facially excludes wilderness programs for only mental health treatment because it placed the exclusion under the "Mental Health, Behavioral Health and Substance Abuse Benefit" section of the Plan, and there "is no listing of 'wilderness' as an excluded service for medical conditions, nor does it appear under the contract's general Exclusions." P.E.L also stresses that Premera has never used the exclusion to deny coverage for medical or surgical services.

Premera offers Dr. Small's testimony in response. Dr. Small testified that Premera does not cover wilderness programs "regardless of whether the scope of the wilderness program was mental health or medical or surgical." He testified that Premera does not list every excluded service in its plans because "there are thousands of services that are not appropriate for coverage with new ones arising frequently." So, historically, "Premera did not list wilderness programs as

21

a separate exclusion" and instead denied "requests for coverage under the nontreatment exclusion," which applies to both medical and mental health services. According to Dr. Small, around 2012, Premera began receiving an increase in mental health claims for wilderness programs, so he recommended they list the exclusion in the mental health section of their health care plans "[i]n order to be as clear as possible" and "to avoid member confusion." He maintained that even though the Plan listed the exclusion under only mental health services, "the wilderness exclusion remains an application of the general non-treatment exclusion."

But in denying P.E.L.'s claim, Premera explained several times that the contractual provision excluding wilderness programs under "mental health services" was the basis of the denial of her claim—not the general nontreatment exclusion. Further, Dr. Small acknowledged that wilderness programs are "typically used to treat mental health conditions" and admitted that he was unaware of any medical or surgical treatment for which a wilderness component is "central" to its activities. He said that there are wilderness or outdoor programs for medical conditions such as camps "that operate for individuals with diabetes and camps that operate for individuals with seizure disorders," and that Premera would exclude those services from coverage as well. But the Plan does not list those programs as excluded medical benefits like it excludes wilderness mental health services.

Viewing the evidence and all reasonable inferences in a light most favorable to P.E.L., a reasonable juror could conclude that the wilderness

No. 82800-2-I/23

exclusion applies to only wilderness mental health services.  See Christiano v.

Spokane County Health Dist., 93 Wn. App, 90, 93, 969 P.2d 1078 (1998) (a court

may rule on a disputed fact on summary judgment as a matter of law only if

reasonable minds could reach but one conclusion).  We reverse and remand the

separate treatment limitation issue for determination by a trier of fact.[22]

2.  Negligent Claims Management

P.E.L. argues that the trial court erred by dismissing her negligent claims-

management allegation because she did not support it with objective

symptomatology of emotional distress.  We disagree.

To prevail on a negligence claim, a plaintiff must show (1) the defendant

owed them a duty, (2) the defendant breached that duty, (3) the plaintiff suffered

an injury, and (4) proximate cause between the breach and the injury.  Tincani v.

Inland Empire Zoological Soc'y, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994).

But in deciding whether to allow damages for emotional distress without physical

injury, Washington courts have balanced the right to compensation for emotional

distress against competing interests in preventing fraudulent claims and holding

tortfeasors responsible proportionately with their degree of culpability.  Bylsma v.

Burger King Corp., 176 Wn.2d 555, 560, 293 P.3d 1168 (2013).

We allow claims for emotional distress without physical injury "only where

emotional distress is (1) within the scope of foreseeable harm of the negligent

conduct, (2) a reasonable reaction given the circumstances, and (3) manifested

---

[22] P.E.L. also contends the trial court erred by dismissing her CPA claim.
Premera says that dismissal was appropriate because it turned on the breach of contract
claim.  Because we reverse the trial court's dismissal of P.E.L.'s breach of contract
claim, we also reverse dismissal of the CPA claim.

No. 82800-2-I/24

by objective symptomatology." Bylsma, 176 Wn.2d at 560. "These requirements were developed to address past concerns that feigned claims of emotional distress would lead to 'intolerable and interminable litigation.' " Id.[23] (quoting Corcoran v. Postal Tel.-Cable Co., 80 Wash. 570, 579-80, 142 P. 29 (1914)). Objective symptomatology requires that a plaintiff's emotional distress amounts to "a diagnosable emotional disorder" and that objective medical evidence proves both "the severity of the distress" and "the causal link between the [negligent behavior] and the subsequent emotional reaction." Hegel v. McMahon, 136 Wn.2d 122, 135, 960 P.2d 424 (1998); Haubry v. Snow, 106 Wn. App. 666, 678-79, 31 P.3d 1186 (2001).

Because P.E.L. shows no objective symptomatology of emotional distress, summary judgment dismissal of her negligence claim was appropriate.[24]

3.  Insurance Bad Faith Claim

P.E.L. also argues the trial court erred by dismissing her insurance bad faith claim because she did not support it with objective symptomatology of emotional distress.  We agree.

Under RCW 48.01.030, insurance providers have an obligation to deal with policy holders in good faith:

> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their

---

[23] Internal quotation marks omitted.

[24] P.E.L. argues she did not allege negligent infliction of emotional distress (NIED) but, rather, a claim of negligence in which she seeks only emotional distress damages.  But Washington courts generally construe such claims as NIED. Bylsma, 176 Wn.2d at 560.

24

representatives rests the duty of preserving inviolate the integrity of insurance.

A breach of that statutory duty "sounds in the tort of bad faith." Woo v. Fireman's Fund Ins. Co., 150 Wn. App. 158, 170, 208 P.3d 557 (2009). To establish bad faith, an insured must show that a breach of the insurer's statutory duty was unreasonable, frivolous, or unfounded. Id. at 171.

We have recognized that traditional contract damages do not provide an adequate remedy for bad faith breach of contract because "an insurance contract is typically an agreement to pay money, and recovery of damages is limited to the amount due under the contract plus interest." Woo, 150 Wn. App. at 171 (quoting Kirk v. Mt. Airy Ins. Co., 134 Wn.2d 558, 560, 951 P.2d 1124 (1998)). So, we have determined that emotional distress damages are available in insurance bad faith actions. See Singh v. Zurich Am. Ins. Co., 5 Wn. App. 2d 739, 759, 428 P.3d 1237 (2018).

Premera argues that P.E.L. must support her insurance bad faith claim for emotional damages with expert testimony. It relies on Dombrosky v. Farmers Insurance Co. of Washington, 84 Wn. App. 245, 262, 928 P.2d 1127 (1996). But Dombrosky involved a claim for NIED. Id. And Washington courts have not required expert testimony to support claims for emotional damages outside the general breach standard in negligence claims. Cf. Kloepfel v. Bokor, 149 Wn.2d 192, 201, 198, 66 P.3d 630 (2003) (distinguishing "torts of intention and torts of negligence" in holding there is no objective symptomatology requirement for intentional infliction of emotional distress). Along those lines, we have rejected the need for expert support of a claim for emotional damages arising from a bad

25

faith insurance action.  See Sykes v. Singh, 5 Wn. App. 2d 721, 732, 428 P.3d 1228 (2018) (in bad faith insurance settlement, court rejected insurer's challenge to award of damages for pain and suffering and emotional trauma based on the lack of expert testimony because insurer failed to show that insured needed expert testimony to support an award of general damages).  We decline to impose such a requirement here.

The trial court erred by dismissing P.E.L.'s bad faith insurance claim for failure to show objective symptomology of emotional distress.

We conclude that genuine issues of material fact remain as to whether Premera's exclusion of wilderness programs is a separate limitation that applies to only mental health services and that the trial court erred by dismissing P.E.L.'s insurance bad faith claim for failure to show objective symptomatology of emotional distress.  We otherwise affirm.  Reversed in part and remanded.


Bowman, J

WE CONCUR:


Chung, J.                    Andrus, C.J.

26